UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
CLAVER CAMPBELL,

                              Index No. 24-cv-6208

                   Plaintiffs,

                -against-                    **COMPLAINT**

SOLAR MOSAIC, LLC; SUNCO CAPITAL, LLC;        **JURY TRIAL DEMANDED**
ATTYX UTAH LLC; ATTYX LLC; AND
WEBBANK,


                   Defendants.
---------------------------------------------------------------------X

      Plaintiff Claver Campbell, through her attorneys The Legal Aid Society, brings this

Complaint against Defendants Solar Mosaic, LLC, SUNco Capital, LLC, ATTYX UTAH LLC,

ATTYX LLC, and WebBank.

<u>**PRELIMINARY STATEMENT**</u>

      1.     Plaintiff Claver Campbell ("Mrs. Campbell"), an elderly homeowner with the

intention of reducing her monthly electricity bills on her home, fell victim to the fraudulent,

deceptive, and abusive business practices and misrepresentations of the Defendants. Mrs.

Campbell was misled to believe she would receive a new roof and new solar panel system for

just $184.00 per month. Without performing any financial evaluation of whether Mrs. Campbell

could afford the payments, even though she lives on a limited fixed income, Defendants forged

her signature on loan documents which she never saw nor agreed to their terms. Unsurprisingly,

Defendants never provided Mrs. Campbell with any of the legally required disclosures or hard

copies prior to agreeing to any roof or solar panel installation.

      2.     After the installation of Defendants' solar panel system, Mrs. Campbell

discovered her signature was forged on loan documents and the abusive and predatory terms on

the loan which were significantly higher than what she was promised and agreed to. Defendants further reneged on their agreement to buy out her lease with her prior solar panel company, SunRun, leaving the removed SunRun solar panels to clutter her small backyard. Despite Mrs. Campbell's attempts at cancellation, Defendants are still seeking payment and have filed a lien against her home. Mrs. Campbell has suffered damages as a result of Defendants' action.

3.       This case illustrates emerging nationwide abusive and deceptive business practices in the residential solar panel industry where it has become common practice for solar panel companies to target seniors and communities of color with outright misleading advertising, misrepresentations, and fraud. Typically, homeowners are solicited to install solar panels on their homes, purportedly financed by various government-funded programs at low or no costs to significantly reduce their energy bills. Homeowners soon discover that the terms they had relied on when the salesperson came to their door, are wildly divergent from the terms that they eventually see on their statements, none of which were accurately disclosed at the time of the sale in violation of federal and state laws.

4.       Several State Attorneys General have sued solar panel companies, including Defendant Solar Mosaic, for their deceptive business practices and consumer fraud.[1] It is the normal business practice of companies such as Defendants to provide financing without evaluating homeowners for affordability.[2]

---

[1] In March 2024, the Minnesota Attorney General sued Solar Mosaic alleging that the cost of the financing advertised to homeowners is lower than the actual costs, inducing homeowners to sign-up for the product and then receiving a bill higher than advertised. *See* Complaint, ¶¶ 1-6, *State of Minnesota v. GoodLeap LLC, et al*. 24-CV-3558.  *See also* Tennessee and Kentucky Attorneys General's lawsuit against Solar Mosaic. *See* Complaint, ¶¶ 158-59, *State of Tennessee and Commonwealth of Kentucky v. Ideal Horizon Benefits, LLC, et al.,* 23-CV-46 (E.D. TN. 2023).

[2] Solar Mosaic advertises its new solar loan product, the PowerSwitch ZERO loan, which defers payments for 12 months, as requiring no financials or documents from the borrower enabling the solar panel company to "close sales faster." *See* Solar Mosaic, *PowerSwitch ZERO, Power Now. Pay Later*, *available at*

5.     In the last three years, consumers nationwide have filed approximately 285 complaints with the Consumer Financial Protection Bureau ("CFPB") against Solar Mosaic, one of the Defendants in this case.  According to an August 7, 2024 CFPB report, solar financing companies, along with solar panel companies, engage in high-pressure sales pitches which tout new tax credits, often by subtracting a projected tax credit from the amount of the loan and showing the lower amount to the homeowner in order to close the sale.[3] Further, homeowners face loan terms that shock the borrower with monthly payments increasing after 12 to 18 months and with energy savings that do not amount to what was promised.

## JURISDICTION AND VENUE

6.     Jurisdiction arises under 28 U.S.C. § 1331 because this Court has original jurisdiction over the federal Truth in Lending (TILA) (*see also* 15 U.S.C. § 1640(e)) claim and the Equal Credit Opportunity Act ("ECOA") claims (*see also* 15 U.S.C. 1691e(f)).

7.     Supplemental jurisdiction over the state law claims arises under 28 U.S.C. § 1367(a).

8.     Venue is proper because the offending conduct took place in this district.

## PARTIES

9.     Plaintiff Claver Campbell ("Mrs. Campbell") is a 76-year-old, Black homeowner who resides at 116-39 171st Street in Jamaica, New York, 11434.

---

https://info.joinmosaic.com/PowerSwitchZERO. All of Solar Mosaic's PowerSwitch ZERO loans are actually made by WebBank.  *See* PR Newswire, *Mosaic Releases New Loan Products to Make Solar Even More Affordable for American Homeowners* (Oct. 20, 2020), *available at* https://www.prnewswire.com/news-releases/mosaic-releases-new-loan-products-to-make-solar-even-more-affordable-for-american-homeowners-301155469.html#:~:text=OAKLAND%2C%20Calif.%2C%20Oct.,percent%20APR%2025%2Dyear%20loan.

[3] *See* CFPB, *Solar Financing* (Aug. 7, 2024), *available at* https://www.consumerfinance.gov/data-research/research-reports/issue-spotlight-solar-financing/.

10.     Defendant Solar Mosaic, LLC ("Solar Mosaic") is a California limited liability corporation with a principal office at 601 12th Street, Suite 325, Oakland, CA 94607.

11.     Solar Mosaic is in the business of offering consumers loans for residential solar panels.

12.     Defendant WebBank ("WebBank") is a Utah State-chartered industrial bank with its principal place of business at 215 South State Street, Suite 1000, Salt Lake City, Utah 84111. WebBank finances Solar Mosaic's loans and is often the originator of Solar Mosaic-branded loans. Defendant WebBank is a foreign business not authorized to do business in New York.

13.     Upon information and belief, Defendants Solar Mosaic, LLC and WebBank are liable either as lenders, creditors, assignees, or other holders under the FTC Holder Rule which subjects Solar Mosaic, LLC and WebBank to any liability that may arise based on the misconduct of the other Defendants or their predecessors in interest.

14.     Defendant SUNco Capital LLC, d/b/a SUNco Solar, is a domestic limited liability company with a principal office at 150 Eileen Way, Suite 5, Syosset, NY 11791. On documents submitted to New York State, Grant Young is listed as SUNco Capital LLC's President and Owner.

15.     Defendant ATTYX Utah LLC is an unauthorized foreign limited liability company with a principal office at 300 S 1350 E, Fl. 5, Lehi, UT, 84043.  On the Utah government website, Grant Young is listed as the registered agent for Defendant ATTYX Utah LLC.

16.     Defendant ATTYX, LLC, a/k/a ATTYX New York LLC, SUNco is a domestic limited liability company with a principal office at 150 Eileen Way, Suite 5, Syosset, NY 11791.

17.    On its website, Defendant ATTYX Utah LLC lists 150 Eileen Way, Suite 5, Syosset, NY 11791 as the mailing address for consumers.

18.    In or around February 2024, Defendant ATTYX Utah LLC stated on its LinkedIn profile that SUNco is now ATTYX.

19.    For purposes of this complaint, Defendants SUNco Capital LLC, ATTYX Utah LLC, and ATTYX, LLC will collectively be referred to as "SUNco," the name of the company at the time Defendants interacted with Ms. Campbell.

20.    As of August 23, 2024, SUNco Capital LLC still maintains its own website: https://www.SUNcoproject.com/.

21.    SUNco is in the business of selling, designing, constructing, installing, and servicing solar energy systems, roofing, and HVAC systems on residential properties.

22.    Solar Mosaic is a financing company that partners with installers and sales companies like SUNco to provide financing for solar panels and other solar products.

23.    Defendants Solar Mosaic and WebBank rely on sales companies such as SUNco to interact with homeowners on its behalf and obtain information about and from the customers during the sales process.

24.    At all relevant times, Defendants Solar Mosaic and WebBank retained the right to control the conduct of sales companies such as SUNco, including the manner of the presentation, the products offered, and the terms and conditions of such products.

25.    At all relevant times, Defendants acted on behalf of and for the benefit of the other Defendants by using deceptive and fraudulent sales tactics to target vulnerable homeowners to agree to transactions which are lucrative to Defendants but unaffordable to homeowners.

26.     Defendants have ratified, approved of, and assumed responsibility for the conduct of the other Defendants and their agents.

27.     Defendants financially benefit from their symbiotic relationship.

## FACTUAL ALLEGATIONS

28.     Mrs. Campbell, a senior citizen, has owned her home since 1992 where she lives with her retired husband, adult daughter, and two grandsons, one 23 years old and one 12 years old.

29.     The home is located at 116-39 171st Street in Springfield Gardens, a community where the majority are Black homeowners. In fact, according to the U.S. Census Bureau website (data.census.gov), of the 66,964 residents of Springfield Gardens, 52,068 identify as Black, or 77.8% of the community's population.

30.     Mrs. Campbell lives on a fixed income consisting of just $881.00 in social security and a small pension of $595.00 from her work at a non-profit.

*The 2016 solar panel purchase*

31.     In May 2016, Mrs. Campbell, seeking to lower her utility costs, entered into a lease agreement for the installation of solar panels on the roof of her home with a company called SunRun, formerly Vivint Solar.  SunRun is not a defendant in this case.

32.     SunRun claimed its solar panels would lower her monthly Con Edison electricity bills which prior to the installation of the solar panels could be as much as $275 per month.

*33.*     Unfortunately, the SunRun solar panels did not yield the promised savings.

*Mrs. Campbell begins working with SUNco*

34.     In or around September 2023, Mrs. Campbell saw an advertisement on Facebook for a free roof and discounted solar panels for eligible senior homeowners.

6

35.     Due to her disappointment with her SunRun solar panels, Mrs. Campbell responded to the advertisement by clicking on it and provided her contact information.

36.     On or about September 11, 2023, an employee or representative of SUNco named "Jake" texted Mrs. Campbell to offer her a no cost roof program and home efficiency upgrade.

37.     Jake asked Mrs. Campbell for her zip code, purportedly to ensure there was "funding" for no or low-cost roof and solar services in Mrs. Campbell's neighborhood.

38.     Once Mrs. Campbell confirmed her zip code, Jake texted Mrs. Campbell stating that an Inflation Reduction Act program would cover the cost of a new roof.

39.     Mrs. Campbell informed Jake that she is a senior on a fixed income.

40.     On or about September 12, 2023, an employee or representative of SUNco named Mitchell Sims ("Mr. Sims") called Mrs. Campbell and scheduled an in-person meeting at her home, telling her to have her SunRun contract and electricity bills to show to him.

41.     On September 13, 2023, Mr. Sims spent approximately one hour with Mrs. Campbell in her family's home to discuss how she could receive a new roof, new solar panels, and maintenance with funding from government subsidies.

42.     Mrs. Campbell told Mr. Sims about her lease agreement with SunRun solar panels which did not provide her with the expected savings.

43.     Mr. Sims promised Mrs. Campbell that with funding from government subsidies, SUNco would do the following:

        a.     buy out her existing SunRun solar panel lease;

        b.     remove the existing SunRun solar panels from her property;

        c.     install a free new roof;

        d.     install new solar panels;

7

      e.      maintain her new roof and solar panels; and

      f.      eliminate her Con Edison electricity bills.

44.     Mr. Sims emphasized to Mrs. Campbell that doing the above would add value to her home.

45.     Mr. Sims then presented Mrs. Campbell with a yellow and grey colored chart on his tablet which purported to provide a detailed breakdown of the pricing. The chart stated the total cost of the system would be $87,400.00 but after the deductions of a federal tax credit of $26,220.00, local tax credit of $5,000.00, and New York state tax credit of $26,220.00, the final total cost would be reduced to only $29,960.00.

46.     The chart also stated her monthly payments would be $184.00 and not due until November of 2024.

47.     Below is a copy of the chart which Mr. Sims texted to Mrs. Campbell.



48.     The yellow and grey colored chart omitted that there would be any finance charges.

49.     Mr. Sims further told Mrs. Campbell that she would no longer receive any bills from Con Edison. Instead, she would receive $1,000 annually from Con Edison.

50.     Relying on Mr. Sims' representation, Mrs. Campbell decided to go along with the project.

51.     At Mr. Sims's request, Mrs. Campbell provided an electronic signature on his tablet without being given the opportunity to read or review the document. Neither did she receive any hard copies of what she had been asked to sign.

52.     More importantly, Mr. Sims never disclosed that the document he asked Mrs. Campbell to "docu-sign" was an agreement containing the cost and terms of financing the solar panel installation.

53.     At Mr. Sims request, Mrs. Campbell showed him her checkbook to allow for automatic payments.

54.     Although Mrs. Campbell had made it clear that she was on fixed income, on information and belief, the Defendants failed to consider whether she could afford the cost of the installation.

55.     On or about September 13, 2023, after Mr. Sims left Mrs. Campbell's home, she received an email from Solar Mosaic, attaching a document which stated that her monthly payments would begin in November 2024 and would be $535.87 over twenty-five years with a final payment of $532.14, totaling $160,757.27.

56.     This was the first time she learned that what she had been asked to sign was actually a "Home Improvement Loan Agreement."

57.     On September 13, 2023, Mrs. Campbell also received an email from kyled@suncoproject.com providing SUNco's contact information, with testimonial videos from current customers, each appearing to be a Black or minority homeowner.

58.      Mrs. Campbell was shocked to learn that her monthly payment would be nearly three-times more than what Mr. Sims had presented to her and that the total loan cost would be $160,757.27 instead of the $29,960 as result of financing charges which were omitted by Mr. Sims when he presented his numbers at her home.

59.     After learning about the actual costs and realizing that on her fixed income there was no way that she could afford to pay $535.87 each month, Mrs. Campbell was determined not to go forward with this project and on September 16, 2023 sent an email notifying Solar Mosaic of her intent to cancel within the three-day deadline, provided by the "Home Improvement Loan Agreement".

60.     On September 16, 2023, Mrs. Campbell received confirmation that her cancellation was received and that her account had been cancelled.

61.     Moments after her cancellation, Mrs. Campbell received a phone call from Mr. Sims asking why she cancelled, telling her that she had made a big mistake and that they would send a representative to her home for her to reconsider.

62.     On or around September 19, 2023, Mr. Sims returned to Mrs. Campbell's home and berated her for being stupid to walk away from a deal that would add value to her home. He insisted that she should ignore the amounts listed in the loan agreement she had received via email and that the real total cost was the amount he had presented to her on the yellow and grey colored chart on his tablet.

63.    Mr. Sims again assured her that as a senior homeowner, she was qualified for government programs, initiatives of Governor Hochul and President Biden.

64.    Mr. Sims then once again wrote out the terms, this time on a piece of yellow paper, which he signed. This yellow piece of paper repeated all the terms that Mr. Sims had previously presented on his chart, claiming that after all the government benefits and tax credits, Mrs. Campbell's total cost would be $29,960 and her monthly payment would be $184.

65.    Other than this handwritten term sheet, Mr. Sim did not provide any other notices or disclosures when he signed it.

66.    Below is a copy of the handwritten term sheet:



67.    Mr. Sims also told Mrs. Campbell that the tax credits would go to SUNco and then Mosaic Solar would reduce the total amount owed so that she would only be responsible for $184 per month.

68.     Relying on Mr. Sims' claims that the numbers on the chart as repeated on the yellow sheet were the true costs for the entire project, Mrs. Campbell acquiesced to the project. She made it clear to Mr. Sims that she would not sign anything and did not sign his tablet that day. Mr. Sims left her home that day without Mrs. Campbell signing his tablet; nor did she apply her signature to any other electronic records from SUNco or Solar Mosaic.

69.     That same day, Mrs. Campbell received multiple emails from Solar Mosaic.

70.     However, she was expressly instructed by Mr. Sims to disregard these emails as they did not contain the terms he had discussed.

71.     Among some of the emails she received was an email from Mosaic bearing a SUNco logo stating she was pre-approved for home improvement financing through Solar Mosaic for up to $135,000.00. It further stated that she would need to submit a loan application by November 18, 2023. However, due to Mr. Sim's explicit instructions to ignore, Mrs. Campbell did not submit a loan application or authorize an application for this amount to be submitted on her behalf.

***SUNco comes to Ms. Campbell's home to install solar panels***

72.     On October 5, 2023 and October 6, 2023, workers arrived at Mrs. Campbell's home, removed the SunRun solar panels from her roof, and installed a new roof with SUNco's solar panel system.

73.     Even though Mr. Sims stated that SUNco would pick up the SunRun solar panels, the workers left the removed SunRun solar panels and equipment in her small backyard. As of the date of this complaint, the SunRun solar panels are still there.

74.     On October 10, 2023, Mrs. Campbell received an email from support@joinmosaic.com bearing the SUNco logo, stating that her monthly payments would be $535.90 with her first monthly payment due November 10, 2024, not the $184 that Mr. Sims had written on the piece of paper he gave her on September 19, 2023.

75.     Attached to the October 10, 2023 email was a loan closing certificate which provided a loan summary from Solar Mosaic and WebBank claiming that the "Loan Start Date" was October 10, 2023, the amount financed was $87,400, and that Mrs. Campbell would be responsible for a total payment of $160,766.65, including financing charges, rather than the $29,960 to which she had agreed.

76.     Mrs. Campbell was shocked when she saw such significantly differing terms from what Mr. Sims had told her and written on the yellow piece of paper on September 19, 2023.

77.     It was around this time that Mrs. Campbell took a closer look at the several emails she had received on September 19, 2023 and September 22, 2023 all of which Mr. Sims had instructed Mrs. Campbell to ignore.  Mrs. Campbell discovered that an image of her electronic signature appeared on the documents attached to those emails, even though she did not sign or authorize any application of her electronic signature to these documents.

***Solar Mosaic Refuses to Cancel the September 19, 2023 "Contract"***

78.     On October 11, 2023, Mrs. Campbell sent an email to Solar Mosaic requesting to cancel the loan agreement that purportedly showed her electronic signature but that she knew she had not signed.  On October 11, 2023, loanservicing@joinmosaic.com responded to Mrs. Campbell stating that the funds had already been disbursed to SUNco and that SUNco must agree to her cancellation request. On October 11, 2023, a "Kaulana Clark from SUNco Solar" using the email address "support@suncoproject.com" emailed Mrs. Campbell stating it was too

late to cancel and that the project had already been completed. Despite receiving Mrs. Campbell's notice of cancellation only one day after the loan start date, Solar Mosaic did not cancel the September 19, 2023 contract and instead placed a UCC-1 lien upon Mrs. Campbell's home.

79.     During her interactions with Mr. Sims and other representatives of SUNco and Solar Mosaic, no one informed Mrs. Campbell that a lien would be placed on her home.

80.     On October 20, 2023, Mrs. Campbell submitted a complaint to the New York Attorney General against SUNco.  Mrs. Campbell also began searching for help to get her out of this situation.

81.     On November 14, 2023, Mrs. Campbell received an email stating her loan agreement had been cancelled. This email was from a Solar Mosaic email address, bearing the SUNco and Solar Mosaic's logos.

82.     However, starting around December 2023, Mrs. Campbell has been receiving monthly statements from noreply@joinmosaic.com. She has never viewed these statements as they require her to log in their website and Mrs. Campbell does not, to her knowledge, have a username or password for Solar Mosaic.

83.     Additionally, as of the date of this complaint, the UCC-1 lien placed by Solar Mosaic on Ms. Campbell's home remains.

84.     On December 8, 2023, Mrs. Campbell received an email from support@SUNcoproject.com stating that SUNco would not buy out her SunRun lease as it was not part of the loan documents. SUNco also stated that SunRun had informed SUNco that it would be suing Ms. Campbell for the remaining amount left on the lease.

85.     On January 11, 2024, Mrs. Campbell received an email from SUNco stating it was too late to cancel her contract and stating again that SUNco was not contractually obligated to buy out her lease with SunRun.

***Solar Mosaic and SUNco's Consumer-Oriented Conduct***

86.     Upon information and belief, Mrs. Campbell's loan is a PowerSwitch ZERO loan since payments were deferred for 12 months and she did not have to provide financials.

87.     The SUNco social media advertisements and website claim to offer a "free roof", the "best price," and to "never charge" hidden fees or surprise payments, however, upon information and belief, homeowners across New York City are subjected to hidden fees and surprise payments.

88.     Upon information and belief, Solar Mosaic knows or should know of SUNco's deceptive marketing. In fact, Solar Mosaic financially benefits from SUNco and other solar panel installers' deceptive sales pitches.

*89.*     According to an August 7, 2024 Consumer Financial Protection Bureau ("CFPB") report, solar lending and solar panel companies engage in high-pressure sales pitches which tout new tax credits, by claiming that projected tax credits will reduce the amount of the loan, completely disregarding that such tax credits are not necessarily available to a particular homeowner depending on their tax liability. *See* CFPB, *Solar Financing* (Aug. 7, 2024), *available at* https://www.consumerfinance.gov/data-research/research-reports/issue-spotlight-solar-financing/. Further, homeowners face loan terms that shock the borrower with monthly payments increasing after 18 months and oftentimes energy savings do not amount to what was promised. (*Id.*).

90.    In 2023, the Attorneys General of Tennessee and Kentucky sued Solar Mosaic LLC for, inter alia, "committing all unfair, deceptive, and abusive practices when offering and providing loans" to consumers for the purchase and installation of solar systems, and for failing to honor requests to cancel. *See State of Tennessee and Commonwealth of Kentucky v. Ideal Horizon Benefits, LLC, et al.,* 23-CV-46 (E.D. TN. 2023).

91.    In the last three years, consumers nationwide have filed approximately 285 complaints against Solar Mosaic with the Consumer Financial Protection Bureau ("CFPB") as of August 8, 2024.

92.    Of these 285 complaints filed with the CFPB, approximately 182 complaints have unique narratives, where the consumer explained Solar Mosaic's abuse ("CFPB Narrative Complaints").

93.    Of the CFPB Narrative Complaints, approximately 61 consumers – or 33.5% of all CFPB Narrative Complaints – complained that Solar Mosaic is billing them for the loan even though the solar panel company never installed any solar panels, installed non-working solar panels, or went out of business before finishing the job.

94.    Of the CFPB Narrative Complaints, approximately 27 consumers – or 14.8% of all CFPB Narrative Complaints – complained that they never signed any loan documents and their signature was a fraud.

95.    Of the CFPB Narrative Complaints, approximately 21 consumers – or 11.5% of all CFPB Narrative Complaints – complained that even though they canceled the contract within the required time-frame and Solar Mosaic confirmed their cancellation, Solar Mosaic is still billing them monthly for the loan.

96.     Many of the complaints also included allegations of fraud and deception in the monthly cost of the Solar Mosaic loan including being told that the consumer would receive a tax benefit which never materialized.

97.     SUNco receives similarly abysmal reviews at the Better Business Bureau ("BBB") website. Of the 54 reviews filed as of August 8, 2024 against SUNco, 31, or 57.4%, are one-star with many alleging deception about the cost, the tax benefits and the fact that the solar panels do not work.

***Advertising and target marketing to seniors and homeowners of color***

98.     As stated previously, SUNco's social media advertisement to Mrs. Campbell specifically advertised a free roof and solar panels for eligible senior homeowners and Mr. Sim's pitches to Mrs. Campbell promoted solar panel government programs only available to seniors.

99.     In *Segui v. Solar Mosaic, LLC et al.*, 24-CV-968 (S.D.N.Y.), the Plaintiff has also alleged that a solar panel salesman who came to her door informed her about a government program to help senior citizens save on their electric bills.

100.    Further, much of SUNco's marketing is to homeowners of color.  As shown below, as of August 19, 2024, four of the five testimonials on SUNco's website are from Black homeowners.



101.   On September 12, 2023, when Mr. Sims first came to Mrs. Campbell's home, he also provided copies of pamphlets advertising a free roof and solar panels and instructed Mrs. Campbell to share these with her friends and neighbors.

102.    On or about March 28, 2024, Mrs. Campbell received a text message from SUNco offering to pay her $1,000 for each person she refers for roof and solar services.

103.   Given that Mrs. Campbell's community of Springfield Gardens is 77.8% Black, this type of "friends and family" marketing has a high likelihood of targeting Black homeowners.

104.   Upon information and belief, Solar Mosaic knew or should have known that SUNco was targeting seniors and minority homeowners with deceptive sale pitches.

105.   Solar Mosaic financially benefited from SUNco's deceptive marketing to seniors and minority homeowners.

*Mrs. Campbell has suffered damages as a result of SUNco and Solar Mosaic's actions*

106.    As a result of Defendant's willful, wanton, reckless, and/or negligent actions, Mrs. Campbell has been damaged.

107.    Mrs. Campbell's home has been burdened with overly expensive solar panels and her backyard is filled with the removed SunRun solar panels interfering with her enjoyment of her backyard.

108.    As stated above, Solar Mosaic placed a lien on Mrs. Campbell's home, encumbering her title and making it harder to refinance or sell.

109.    Solar Mosaic and SUNco's willful, wanton, reckless, and/or negligent conduct has resulted in Mrs. Campbell being fraudulently duped into contracts she never saw, burdened with solar panels under terms she never agreed to, and subjected to wrongful demands for payment pursuant to these forgeries.

110.    In trying to cancel the Solar Mosaic loan and the SUNco contract, Mrs. Campbell has incurred out-of-pocket expenses.

111.    Moreover, Mrs. Campbell has suffered mental and emotional distress, worry, and aggravation as a result of Defendants' actions.

## FIRST CAUSE OF ACTION
(Against Solar Mosaic and WebBank)

### VIOLATION OF THE TRUTH IN LENDING ACT

112.    Plaintiff realleges and incorporates all  the foregoing facts and allegations as if fully set forth herein.

113.    This is a consumer protection action for damages under the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq*.

114.    The stated purpose of the TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).

115.    The TILA mandates that lenders disclose certain costs of credit associated with the transaction prior to consummation of the transaction. 15 U.S.C. § 1631(a).

116.    Disclosures mandated under the TILA include use of the "amount financed," "finance charge," "total of payments," and "annual percentage rate", as well as a "descriptive explanation" of each of these terms.  15 U.S.C. §1638(a)(2)–(5); Reg. Z, §1026.18(b), (d)–(e), (h).

117.    The TILA also requires the disclosure of "[t]he number, amount, and due dates or period of payments scheduled to repay the total of payments." 15 U.S.C. §1638(a)(6).

118.    Further, the TILA requires delivery of two copies of the notice of the right to rescind which clearly and conspicuously disclose the date the rescission period ended. See § 125(a) of the Act, 15 U.S.C. § 1635(a), Regulation Z § 226.23(b), 12 C.F.R. § 226.23(b).

119.    The TILA mandates that these disclosures be written in a manner that is accurate, clear and conspicuous.  *See* 15 U.S.C. §§ 1632(a), 1638(a)(2)–(5); Reg. Z, §1026.17(a).

120.    "The creditor shall make disclosures before consummation of the transaction." Reg. Z, §1026.17(b).

121.    Accurate disclosures are necessary for consumers to be able to make meaningful comparisons of credit alternatives. 15 U.S.C. § 1638.

122.    Defendants Solar Mosaic and WebBank, through either their platform, their agent, or both, did not provide the mandatory disclosures in a conspicuous manner prior to the

consummation of the fraudulent transaction and thus did not comply with the requirements of the TILA and Regulation Z.

123.    Defendants Solar Mosaic and WebBank violated the TILA and Regulation Z with misleading disclosures including by providing an inaccurate calculation of the amount financed, by failing to provide an accurate itemization, and by failing to identify the creditor. As a result of Defendants Solar Mosaic and WebBank's violations of the TILA, Plaintiff was unable to make a meaningful assessment or comparison to alternatives of the amount which Defendant has since represented that Plaintiff is expected to pay.

124.    As a result of these violations, Plaintiff is entitled to actual and statutory damages, cancellation or recission of any subject contracts, and reasonable attorneys' fees and costs. 15 U.S.C. § 1640.

**SECOND CAUSE OF ACTION**
(Against All Defendants)

**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349**

125.    Plaintiff realleges and incorporates all of the foregoing facts and allegations as if fully set forth herein.

126.    Defendants' sales and sales practices are subject to the New York General Business Law § 349 ("GBL § 349").

127.    Under GBL § 349, deceptive acts or practices in the conduct of any business in the State of New York are unlawful.

128.    Each of the deceptive acts and practices set forth herein constitute violations of GBL § 349 independent of whether these acts and practices constitute violations of any other law.

129.    To wit, wholly apart from any other violations of law alleged in this Complaint, the Defendants' acts and practices on behalf of themselves constitute violations of GBL § 349, which makes deceptive acts in the conduct of business, trade, commerce or the furnishing of a service in this state, unlawful, independent of whether these acts and practices constitute violations of any other law.

130.    These deceptive acts and practices were committed in conduct of business, trade, commerce or the furnishing of a service in this state.

131.    Each of these actions was consumer-oriented and involves misleading conduct that is recurring given that Defendants are still advertising their solar panels and has a broad impact upon the public, or, in the alternative, such misleading practices are the types that could easily recur, could potentially impact similarly situated consumers, and are therefore consumer-oriented and harmful to the public at large.

132.    These false and deceptive consumer-oriented actions misrepresent the actual rights and obligations of consumers.

133.    Indeed, far from a "one-shot transaction," Defendants engage in the allegedly unlawful conduct on a routine basis with a large number of consumers using standardized policies, procedures, electronic devices and applications as demonstrated in the themes that have emerged in the consumer complaints.

134.    Defendants' misconduct as set forth above is thus part of a recurring policy and practice.

135.    This misconduct includes, *inter alia*, inducing consumers to have solar panels installed through the use of forgery and fraud.

136.    Defendants engaged in deceptive acts or practices in the conduct of their business, trade, or commerce, and in the furnishing of any service in New York, which includes but is not limited to:

    a.  misrepresenting to Plaintiff the terms of the Home Improvement Loan Agreement;

    b.  Deceiving Plaintiff about the cost, quality, and terms, among other things, regarding the solar panels;

    c.  Misrepresenting that Plaintiff would receive government and tax benefits;

    d.  Employing policies and practices that enabled forgery and fraud with respect to the Home Improvement Loan Agreement;

    e.  Forging Plaintiff's signatures on the Home Improvement Loan Agreement;

    f.  Failing to disclose that a lien would be placed on Plaintiff's property;

    g.  Using fraudulent, deceptive, and misleading statements with the purpose and effect of inducing Plaintiff to agree to the installation of the solar panel system; and,

    h.  Refusing to honor Plaintiff's notice of cancellation.

137.    Defendants' conduct stated herein violates GBL § 349.

138.    Defendants committed the above-described acts willfully and/or knowingly.

139.    As a direct and proximate result of these violations of GBL § 349, Plaintiff has suffered damages, which include among other things the purported contractual obligations under the Home Improvement Loan Agreement, which total in excess of $160,000.00, the costs associated with removing the solar panels from the roof of the house, the costs associated with reinstalling the solar panels from her previous solar company (including any necessary repairs).

140.    Plaintiff is entitled to preliminary and permanent injunctive relief, and to recover actual and treble damages, costs and attorney's fees.

### THIRD CAUSE OF ACTION
(Against All Defendants)

### FRAUD

141.    Plaintiff repeats and realleges all of the foregoing facts and allegations as if fully set forth herein.

142.    Defendants fraudulently and knowingly induced plaintiff to enter into a purported agreement to install solar panels along with a new roof and the buyout and removal of existing solar panels by making intentional misrepresentations and omitting material information, including but not limited to the following:

    a.    Misrepresenting that the entire cost of the installation to plaintiff would be $29,966.00 when the actual total cost would be $160,757.27;

    b.    Misrepresenting that the monthly cost to plaintiff would be $184.00 when in fact Defendants knew monthly costs would to be $535.87, an amount Defendants knew plaintiff could not afford on her fixed income;

    c.    Omitting that the transaction required financing costs that by far exceeded the costs as claimed by Defendants;

    d.    Claiming that federal, state and local tax credits would reduce the total cost of the installation even though Defendants knew that plaintiff could not avail herself of the claimed tax credits given her limited income;

    e.    Claiming that the "Inflation Reduction Act" would cover the cost to the roof;

    f.    Claiming that plaintiff would no longer have to pay Con Edison bills, and that Con Edison instead would be paying her $1000 per year;

g.  Claiming that Defendants would buy-out and remove the solar panels installed by SunRun.

143.    In addition, Defendants fraudulently and knowingly claimed that Plaintiff had entered into the September 19, 2023 financing agreement by forging her signature even though they knew that Plaintiff had cancelled the prior agreement and had neither reviewed nor signed the September 19, 2023 agreement, and fraudulently caused a UCC-1 lien to encumber her home.

144.    Defendants made these representations and omissions knowing they were false at the time they were made.

145.    Plaintiff suffered serious injury as the proximate result of her reliance on Defendants' intentional misrepresentations and failure to disclose the material terms of the transaction which include but are not limited to mental and physical anguish.

146.    Defendants' actions were willing, intentional and knowing, rendering the transaction with Defendants null and void.

147.    In addition, Defendants are liable to plaintiff for actual damages, punitive damages, cost and disbursement and attorneys' fees

**FOURTH CAUSE OF ACTION**
(Against ATTYX, ATTYX Utah, and SUNco)

**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 770**

148.    Plaintiff realleges and incorporates all of the foregoing facts and allegations as if fully set forth herein.

149.    Defendants ATTYX, ATTYX Utah and SUNco ("SUNco Defendants") are entities that operate a home improvement business, that offer to undertake or agree to perform such home improvement for a fee and for which the total cash price of all of SUNco Defendants'

home improvement contracts have exceeded $1,500 during a period of twelve consecutive months.

150.    The SUNco Defendants are home improvement contractors as defined under NY GBL § 770.

151.    NY GBL § 771-a provides: "No home improvement contractor shall engage in any activity, transaction, or course of business or pay or receive any fee, payment, money, or other thing of value in connection with the financing of a home improvement contract without fully disclosing such activity, transaction, or course of business and any fees, payment, or other thing of value paid or to be paid in connection therewith, and without having obtained the agreement in writing from all parties to the transaction to such activity and the payment therefor."

152.    The SUNco Defendants did not obtain any written agreement from Plaintiff before installing the solar panel system.

153.    A home improvement contract must contain a notice to the owner of their right to "cancel the home improvement contract until midnight of the third business day after the day on which the owner has signed an agreement or offer to purchase relating to such contract." New York Gen. Bus. Law § 771(h).

154.    Plaintiff never signed the Home Improvement Loan Agreement. However, when Plaintiff sent Defendants notice of cancellation requesting that Defendants terminate the contracts, Defendants refused to honor the notice of cancellation.

155.    Defendants continue to deem Plaintiff bound by the forged Home Improvement Loan Agreement.

156.    The SUNco Defendants made false and fraudulent representations with the purpose and effect of inducing Plaintiff to agree to the installation of the solar panel system.

157.    Plaintiff relied on the sales agent's false and fraudulent representations in agreeing to proceed with the installation of the solar panel system.

158.    As a result of the SUNco Defendants' action and/or inaction, Plaintiff has suffered damages, which include the purported contractual obligations under the Home Improvement Loan Agreement, which total in excess of $160,000.00, harm to Plaintiff's credit, the costs associated with removing the solar panels from the roof of the house, and the costs associated with reinstalling the solar panels from her previous solar company (including any necessary repairs).

159.    As a result of these violations, Plaintiff is entitled to actual and statutory damages, injunctive relief, and reasonable attorneys' fees and costs.

### FIFTH CAUSE OF ACTION
(Against Defendant Solar Mosaic and WebBank)

### VIOLATION OF NEW YORK'S UNIFORM COMMERCIAL CODE

160.    Plaintiff realleges and incorporates all of the foregoing facts and allegations as if fully set forth herein.

161.    New York's Uniform Commercial Code ("NY UCC") §9-509 provides that a party may only file a financing statement where the debtor authorizes a filing or has agreed to become bound by a security agreement.

162.    NY UCC § 9-510 provides that a filed financing statement is ineffective to perfect a security interest where the filing is not authorized.

163.    UCC § 9-203 requires a signed and authenticated security agreement for an enforceable security interest.

164.    Defendants Solar Mosaic and WebBank filed or caused to be filed an unauthorized financing statement with the City Register of the City of New York, in particular a UCC-1 Financing Statement filed in the real estate records associated with Plaintiff's residence (hereinafter the "UCC-1 Financing Statement").

165.    The UCC-1 Financing Statement Defendants Solar Mosaic and WebBank filed or caused to be filed alleges a secured purchase money security interest against Plaintiff in favor of Defendant Solar Mosaic resulting from a lien and purchase money obligation.

166.    Plaintiff did not authorize the filing of the UCC-1 Financing Statement and did not authorize or otherwise agree to the "Home Improvement Agreement" and "Operations and Maintenance Agreement" referenced therein.

167.    Plaintiff did not agree to any security agreement permitting the UCC-1 Financing Statement.

168.    There is no signed and authenticated or otherwise authorized security agreement between Plaintiff and Defendant as required for an enforceable security interest.

169.    Even though Defendants Solar Mosaic and WebBank's employee, agent, or representative promised Plaintiff that the solar panels would add value to her property, in reality Defendants Solar Mosaic filed or caused filing of an unauthorized UCC-1 fixture filing which to date still appears on the New York City Automated City Register Information System (ACRIS) as a fixture lien associated with Plaintiff's residence.

170.    As a result of these violations, Plaintiff has been damaged and is entitled to actual and statutory damages pursuant to NY UCC § 9-625 as well as declaratory relief.

**SIXTH CAUSE OF ACTION**
(Against All Defendants)

**AGE DISCRIMINATION IN VIOLATION OF THE EQUAL CREDIT
OPPORTUNITY ACT**

171.    Plaintiff realleges and incorporates all of the foregoing facts and allegations as if fully set forth herein.

172.    In 1974, Congress enacted the Equal Credit Opportunity Act ("ECOA"). ECOA makes it unlawful for a creditor to discriminate against an applicant during "any aspect" of a credit transaction "on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a).

173.    ECOA defines "creditor" as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." *Id.* § 1691a(e).

174.    ECOA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." *Id.* § 1691a(d).

175.    An applicant is defined as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." *Id.* § 1691a(b).

176.    Aspects of credit transactions that are encompassed by ECOA's anti-discrimination mandate include the amount of credit extended, the repayment terms of that credit, and the denial of credit. For creditors who are also sellers, an aspect of the credit

transaction includes the performance or delivery of the goods and services that are secured by credit, and the actions taken to secure the credit.

177.    ECOA also protects against "reverse redlining," which occurs when a creditor extends credit to a protected class for a predatory product or arranges credit for a predatory product, and intentionally targets or has a disparate impact or effect on people who are members of a protected class. Predatory products include products that are financed by debt and disadvantage the borrower and/or prevent the borrower from repaying the loan.

178.    Defendants are each creditors within the meaning of 15 U.S.C. § 1691a(e) because of either their participation in making and arranging the extension, renewal, or continuation of loans for solar panels or they are an assignee.

179.    Defendants caused Plaintiff to apply for and take out credit for the purchase of solar panels.

180.    Plaintiff is an "applicant" because she applied for an extension, renewal, or continuation of a loan within the meaning of 15 U.S.C. § 1691a(b).

181.    As a senior citizen, Plaintiff is a member of a protected class. *Id*. § 1691(a)(1).

182.    Defendants intentionally used marketing, advertising and recruiting techniques to target their solar panels and the accompanying loans to individuals on the basis of age, with the understanding that such individuals were highly likely to fall prey to the sale tactics to purchase their solar panels and finance the purchase of those solar panels.

183.    By extending and arranging for the extensions of credit to Plaintiff for a loan that was more expensive than advertised, did not disclose all terms and did not take into account the Plaintiff's ability to repay, Defendants committed unlawful reverse redlining in violation of 15 U.S.C. § 1691(a).

184.     As a result of these actions, Defendants caused Plaintiff damages.

185.     Plaintiff is entitled to actual and punitive damages, declaratory and injunctive relief, and reasonable attorney's fees and costs as authorized by 15 U.S.C. § 1691e.

**SEVENTH CAUSE OF ACTION**
(Against All Defendants)

**RACE DISCRIMINATION IN VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**

186.     Plaintiffs reallege and incorporate all of the foregoing facts and allegations as if fully set forth herein.

187.     In 1974, Congress enacted the Equal Credit Opportunity Act ("ECOA"). ECOA makes it unlawful for a creditor to discriminate against an applicant during "any aspect" of a credit transaction "on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a).

188.     ECOA defines "creditor" as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." *Id*. § 1691a(e).

189.     ECOA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." *Id.* § 1691a(d).

190.     An applicant is defined as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." *Id.* § 1691a(b).

191.    Aspects of credit transactions that are encompassed by ECOA's anti-discrimination mandate include the amount of credit extended, the repayment terms of that credit, and the denial of credit. For creditors who are also sellers, an aspect of the credit transaction includes the performance or delivery of the goods and services that are secured by credit, and the actions taken to secure the credit.

192.    ECOA also protects against "reverse redlining," which occurs when a creditor extends credit to a protected class for a predatory product or arranges credit for a predatory product, and intentionally targets or has a disparate impact or effect on people who are members of a protected class. Predatory products include products that are financed by debt and disadvantage the borrower and/or prevent the borrower from repaying the loan.

193.    Defendants are each creditors within the meaning of 15 U.S.C. § 1691a(e) because of either their participation in making and arranging the extension, renewal, or continuation of loans for solar panels or because they are an assignee.

194.    Defendants caused Plaintiff to apply for and take out credit for the purchase of solar panels.

195.    Plaintiff is an "applicant" because she applied for an extension, renewal, or continuation of a loan within the meaning of 15 U.S.C. § 1691a(b).

196.    As a Black applicant, Plaintiff is a member of a protected class. *Id.* § 1691(a)(1).

197.    Defendants intentionally used marketing, advertising and recruiting techniques to target their solar panels and the accompanying loans to individuals on the basis of race, with the understanding that such individuals were highly likely to fall prey to the sale tactics to purchase their solar panels and finance the purchase of those solar panels.

198.    By extending and arranging for the extensions of credit to Plaintiff Campbell for a loan that was more expensive than advertised, did not disclose all terms, and did not consider the borrower's ability to repay, Defendants committed unlawful reverse redlining in violation of 15 U.S.C. § 1691(a).

199.    As a result of these actions, Defendants caused Plaintiff damages.

200.    Plaintiff is entitled to actual and punitive damages, declaratory and injunctive relief, and reasonable attorney's fees and costs as authorized by 15 U.S.C. § 1691e.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully request the following relief:

A.   Equitable relief in the form of rescission of the transaction between the parties;

B.   Termination of any security interests relating to the transaction;

C.   Declaratory judgment that any lien or UCC-1 financing statement claimed by Defendants against Plaintiff is removed;

D.   Defendants must cease and desist from contacting Plaintiff in an effort to execute upon any assets or alleged collateral;

E.   Equitable relief requiring Defendants to remove their solar panels, reinstall the solar panels from her previous solar company, and repair any damage caused to the home;

F.   Actual and/or compensatory damages against all Defendants in an amount to be proven at trial;

G.   Statutory damages pursuant to the TILA, 15 U.S.C. § 1640(a)(2); GBL § 772(1); and NY UCC § 9-625(e);

H.   Treble damages pursuant to GBL § 349(h);

I.   Punitive damages pursuant to ECOA, 15 U.S.C. § 1691e(b);

J.   Award Plaintiff reasonable attorney's fees, costs, and litigation expenses;

K.   Award pre-judgement and post-judgement interest, to the extent allowable by law;

and

L.   Grant Plaintiff such other and further relief as this Court finds may be just and proper.

### **<u>JURY TRIAL DEMANDED</u>**

Plaintiff requests a jury on all claims so triable.

Dated: September 5, 2024
        Queens, New York

Respectfully submitted,

THE LEGAL AID SOCIETY

By: *<u>/s/ Jennifer N. Levy, Esq.</u>*
Jennifer N. Levy, Esq.
Claire P. Mooney, Esq.
Oda C. Friedheim, Esq.
Elizabeth M. Lynch, Esq.
153-01 Jamaica Ave.
Jamaica, NY 11432
Tel: (718) 286-2450